# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| LYDIA GRUBER and LOUISE FERDINAND, on behalf of themselves and all others similarly situated, <br><br> *Plaintiff,* <br><br> *v.* <br><br> STARION ENERGY, INC., <br><br> *Defendant.* | Civil Action No. 3:14-cv-01828-SRU |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND AND COUNTERSTATEMENT OF FACTS .........................................3

        A.      Defendant's Business Model ..................................................................3

        B.      Additional Factual Allegations in the SAC Concerning Plaintiffs'
                Standing ................................................................................................7

                1.      Plaintiff Lydia Gruber .................................................................7

                        a.      Plaintiff Gruber Has Standing to Bring Claims
                                on Behalf of a Connecticut Class ...................................7

                        b.      Defendant's Factual Challnges to Gruber's Standing
                                are Without Merit .........................................................8

                2.      Plaintiff Louise Ferdinand ........................................................11

                        a.      Plaintiff Ferdinand Has Standing to Bring Claims
                                on Behalf of a Massachusetts Class ..............................11

                        b.      Defendant's Factual Challenges to Ferdinand's Standing
                                are Without Merit .......................................................12

III.    STANDARD OF REVIEW .....................................................................................13

IV.     ARGUMENT .......................................................................................................13

        A.      Plaintiffs State a Statutory Consumer Protection Claim..........................13

                1.      Starion Engaged in Misleading or Deceptive Acts or Practices
                        Under Both Connecticut and Massachusetts Law .........................13

                        a.      Defendant's Argument That Its Connecticut Conduct
                                Does Not Amount to a Deceptive Act or Practice
                                Under CUTPA is Without Merit.....................................14

                        b.      Plaintiff Gruber Has Pled Her Fraud-Based CUTPA Claim
                                With the Particularity Required Under Fed. R. Civ. P. 9(b)................17

                        c.      Defendant's Argument That Its Massachusetts Conduct
                                Does Not Amount to a Deceptive Act or Practice
                                Under the MCPA is Without Merit..................................19

2.    Starion Engaged in Unfair Acts or Practices Under
      Both Connecticut and Massachusetts Law ...................................21

          a.    Defendant's Actions Offend Public Policy............................................22

          b.    Defendant's Misrepresentations are Immoral,
                Unethical, Oppressive or Unscrupulous ................................23

          c.    Defendant's Misrepresentations Are Substantially
                Injurious to Consumers ........................................................25

B.    Plaintiffs State a Claim That Defendant Breached the
      Covenant of Good Faith and Fair Dealing ............................................26

C.    Plaintiffs Have Standing to Request Injunctive Relief ........................31

D.    Plaintiffs May Seek Declaratory Relief ................................................33

V.    CONCLUSION ........................................................................................35

## TABLE OF AUTHORITIES

**Cases**

*A-G Foods, Inc. v. Pepperidge Farm, Inc.,*
   216 Conn. 200 (Conn. 1990)..................................................................................................23

*Ackerman v. Coca–Cola Co.,*
   No. 09–CV–395, 2013 WL 7044866 (E.D.N.Y. July 18, 2013) ...........................................31

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..............................................................................................................13

*Aspinall v. Phillip Morris Cos., Inc.,*
   813 N.E.2d 476 (Mass. 2004) ...............................................................................................21

*Belfiore v. Procter & Gamble Co.,*
   No. 14-CV-4090, 2015 WL 1402313 (E.D.N.Y. March 25, 2015)................................. 31-32

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)..............................................................................................................13

*Boulevard Assocs. v. Sovereign Hotels, Inc.,*
   72 F.3d 1029 (2d Cir. 1995)..................................................................................................24

*Caires v. JP Morgan Chase Bank N.A.,*
   880 F. Supp. 2d 288 (D. Conn. 2012)................................................................................... 31

*Caldor v. Heslin,*
   577 A.2d 1009 (Conn. 1990) ................................................................................................ 14

*Capstone Building Corp. v. American Motorists Ins. Co.,*
   308 Conn. 760 (2013) ........................................................................................................... 30

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983)................................................................................................................33

*City of New York v. McDonough St. Comm. Ctr., Inc.,*
   No. 13-CV-03869 (FB)(RER), 2014 WL 4467818 (E.D.N.Y. Sept. 9, 2014) ......................35

*Commercial Union Ins. Co. v. Seven Provinces Inso. Co.,*
   217 F.3d 33 (1st Cir. 2000)............................................................................................. 24-25

*Country Club Assocs. v. Shaw's Supermarkets, Inc.,*
   643 F. Supp. 2d 243 (D. Conn. 2009)................................................................................... 13

*Del. State. Univ. Student Hous. Found. v. Ambling Mgmt. Co.,*
   556 F. Supp. 2d 367 (D. Del. 2008)...................................................................................... 34

*Delgado v. Ocwen Loan Servicing, LLC,*
    No. 13–CV–4427, 2014 WL 4773991 (E.D.N.Y. Sept. 24, 2014) ........................................ 32

*Deshawn E. by Charlotte E. v. Safir,*
    156 F.3d 340 (2d Cir. 1998) ................................................................................................. 33

*E. Point Sys., Inc. v. Maxim,*
    No. 13-cv-00215 (VLB), 2014 WL 523632 (D. Conn. Feb. 7, 2014) .................................... 19

*Faistl v. Energy Plus Holdings, LLC*,
    No. 12-2879 (JLL), 2012 WL 3835815 (D.N.J. Sept. 4, 2012) ............................................ 28

*Gabriel v. Jackson National Life Ins. Co.,*
    No. 11-12307-MLW, 2015 WL 1410406 (D. Mass. March 26, 2015) ................................... 25

*Global Fresh Produce, Inc. v. Epicure Trading, Inc.,*
    No. 11–01270 (CCC), 2012 WL 924326 (D.N.J. Mar. 16, 2012) ......................................... 34

*Gupta v. New Britain General Hospital,*
    239 Conn. 574 (1996) ........................................................................................................... 26

*Halo Tech. Holdings, Inc. v. Cooper,*
    No. 07-cv-489 (SRU), 2010 WL 1330770 (D. Conn. March 31, 2010) ................................ 24

*HLO Land Ownership A. Ltd. v. Hartford,*
    248 Conn. 350 (1999) ........................................................................................................... 30

*Hoffnagle v. Henderson,*
    No. CV020813972S, 2003 WL 21150549 (Conn. Super. Ct. Apr. 17, 2003) ...................... 26

*In re Trilegiant Corp., Inc.,*
    11 F. Supp. 3d 82 (D. Conn. 2014) ....................................................................................... 19

*Int'l Fid. Ins. Co. v. Wilson,*
    443 N.E.2d 1308 (Mass. 1983) ............................................................................................. 21

*Jaghory v. N.Y. State Dep't of Educ.,*
    131 F.3d 329 (2d Cir. 1997) ................................................................................................. 13

*James L. Turkle Trust v. Wells Fargo & Co.,*
    602 Fed. Appx. 360 (9th Cir. 2015) ...................................................................................... 21

*JJCK, LLC v. Project Lifesaver Int'l,*
    No. 10-930-LPS, 2011 WL 2610371 (D. Del. July 1, 2011) ................................................. 35

*Koenig v. Boulder Brands, Inc.,*
    No. 13-CV-1186(ER), 2014 WL 349706 (S.D.N.Y. Jan. 31, 2014) ...................................... 13

*L.S. v. Webloyalty.com, Inc.,*
   No. 10-cv-1372 (CSH), 2014 WL 3547640 (D. Conn. July 17, 2014)...................................19

*Linkage Corp. v. Trustees of Boston Univ.,*
   679 N.E.2d 191 (Mass. 1997) ......................................................................................... 21

*Lord v. Int'l Marine Ins. Servs.,*
   No. 08-cv-1299(JCH), 2013 WL 5346507 (D. Conn. Sept. 23, 2013)...................................14

*Magnan v. Anaconda Industries,*
   193 Conn. 558 (1984) ..................................................................................................... 26

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,*
   412 F.3d 215 (1st Cir. 2005)....................................................................................... 23, 31

*Metra Indus., Inc. v. Rivanna Water & Sewer Auth.,*
   No. 3:12CV00049, 2014 WL 652253 (W.D. Va. Feb. 19, 2014)....................................... 34

*Navarez v. Wilshire Credit Corp.,*
   757 F. Supp. 2d 621 (N.D. Tex. 2010) ........................................................................ 35

*NCC Sunday Inserts, Inc. v. World Color Press, Inc.,*
   692 F. Supp. 327 (D. Conn. 1988).....................................................................................19

*Peck v. Baldwinsville Cent. Sch. Dist.,*
   351 Fed. Appx. 477 (2d Cir. 2009)....................................................................................34

*Ries v. Arizona Beverages,*
   287 F.R.D. 523 (N.D. Cal. 2012)......................................................................... 32, 33-34

*Royal Indem. Co. v. King,*
   532 F. Supp. 2d 404 (D. Conn. 2008).......................................................................... 27

*Sadowski v. Dell Computer Corp.,*
   268 F. Supp. 2d 129 (D. Conn. 2003)...................................................................... 29, 30-31

*Saravia v. Select Portfolio Servicing, Inc.,*
   No. 13-cv-01921-RDB, 2014 WL 2865798 (D. Md. June 23, 2014)................................... 20

*Slack v. Suburban Propane Partners,*
   No. 10-2548 (JLL), 2010 WL 5392845 (D.N.J. Dec. 22, 2010)................................27-28, 29

*Stanley Works v. Halstead New England Corp.,*
   No. CV010506367S, 2001 WL 651208 (Conn. Sup. Ct. May 18, 2001) ............................ 29

*Tello v. Bank of Am. N.A.,*
   No. 12-cv-01040-GMN-NJK, 2014 WL 99299 (D. Nev. Jan. 3, 2014) ............................... 20

v

*Torchlight Loan Servs., LLC v. Column Fin. Inc.,*
No. 11 Civ. 7426 (RWS), 2912 WL 3065929 (S.D.N.Y. July 25, 2012) ............................ 34

*ULC Oil & Gas Field Servs. v. EXCO Res. (PA), LLC,*
No. 2:14-cv-72, 2014 WL 6607280 (W.D. Pa. Nov. 19, 2014)............................................. 35

*Ventres v. Goodspeed Airport, LLC,*
275 Conn. 105 (2005) ......................................................................................................21

*Ward v. Thomas,*
207 F.3d 114 (2d Cir. 2000)...........................................................................................34

*Weihai Textile Group Import & Export Co., Ltd. v. Level 8 Apparel., LLC,*
No. 11 Civ. 4405(ALC)(FM), 2014 WL 1494327 (S.D.N.Y. March 28, 2014)............... 34-35

*Wood ex rel. U.S. v. Applied Research Assocs., Inc.,*
328 F. Appx. 744 (2d Cir. 2009)...................................................................................... 17

*Yang Chen v. Hiko Energy,*
Nos. 14cv1771(VB), 14cv2042(VB),
2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) ..............................................................15, 28

*Zahn v. North American Power & Gas LLC,*
No. 14 C 8370, 2015 WL 2455125 (N.D. Ill. May 22, 2015) ................................. 15-17, 25

*19 Perry St., LLC v. Unionville Water Co.,*
294 Conn. 611 (2010) ........................................................................................................ 29

## Statutes and Rules

Conn. Gen. Stat. §16-245o(f)(1) .........................................................................................18

Conn. Gen. Stat. §16-245o(f)(2) ........................................................................................ 22

Conn. Gen. Stat. §42-110a *et seq.* ("CUTPA") ......................................................13-19, 22-26

Fed. R. Civ. P. 9(b) ......................................................................................................... 17-19

Mass. Gen. Laws Ann. Ch. 93A ("MCPA")...................................................1, 13-14, 19-21, 22-26

220 CMR §11.06.................................................................................................................18

940 CMR §19.04.................................................................................................................22

**Other Authorities**

Restatement (Second) of Contracts, §205 ................................................................................ 26

Williston on Contracts, §4:24 (4th Ed.) ................................................................................. 29

## I.      INTRODUCTION

At a hearing on April 7, 2015, this Court largely sustained Plaintiff Lydia Gruber's substantive claims in her initial Class Action Complaint [ECF No. 1].  That initial Complaint alleged that Defendant Starion Energy, Inc., violated state consumer protection statutes and the covenant of good faith and fair dealing by improperly charging up to **six times** the prevailing wholesale rate for electricity to its variable rate plan customers, notwithstanding language in its contract that specifically links its variable rate to underlying wholesale market conditions.  *See* [ECF No. 1] at ¶¶3-5, 25-26.

The Court identified only two deficiencies in the Complaint: first, "[w]e need more detail regarding … the basis for alleging that Ms. Gruber has standing," and second, "[i]deally the complaint would be amended to include a Massachusetts plaintiff."  Transcript of Motion Hearing dated April 7, 2015 ("Mot. Tr.") at. at 41:18-22.  The Court concluded by noting that, with the exception of those two issues, the initial Complaint stated a claim.  *Id.* at 42:4-8 ("[I]t appears to me if more detail is added [regarding Gruber's standing and a Massachusetts plaintiff] that the complaint **does state a cause of action.**   Again, it may well be one that cannot be proven, but that's for a different day.") (Emphasis added).

On June 1, 2015, Plaintiff Gruber, in conjunction with newly-added Plaintiff Louise Ferdinand (collectively, "Plaintiffs"), filed a Second Amended Class Action Complaint ("SAC") [ECF No. 52] addressing the Court's concerns.[1]  The SAC pleads substantial additional detail concerning Gruber's (and Ferdinand's) losses and standing, as well as additional detail

---

[1]  Prior to the SAC, Plaintiffs filed a first Amended Complaint on April 28, 2015 [ECF No. 47], that was identical to the SAC except that it did not include a claim for violation of the Massachusetts Regulation of Business Practices for Consumers' Protection Act, so as to give Defendant thirty days to respond to Plaintiffs' demand letter under Mass. Gen. Laws Ann. Ch. 93A, §1.  Plaintiffs filed the SAC when Defendant failed to offer full relief within the thirty day period.

concerning Defendant's pricing misconduct. *See* SAC at ¶¶31, 36-38, 39-47.[2]  In addition, Ferdinand is a Massachusetts resident and customer, resolving any concern regarding her standing to bring claims under Massachusetts law.[3]  Accordingly, Plaintiffs have fully responded to the issues raised by the Court.

Rather than simply address the sufficiency of Plaintiffs' new allegations, Defendant in its Memorandum of Law in Support of its Motion to Dismiss [ECF No. 55] ("Def. Mem.") relitigates its entire motion to dismiss, including numerous arguments already considered by the Court at the April 7 hearing.  Defendant's Motion should be denied in its entirety.

In its only new argument that directly addresses the Court's concerns at the April 7 hearing, Defendant wrongly asserts that neither Gruber nor Ferdinand suffered an ascertainable loss.  However, Defendants' own charts demonstrate that each Plaintiff *did* suffer damages from Starion's refusal to honor the terms of its own contracts.  *See* Parts II.B.1 & 2 below.

Defendant also argues for the first time that Plaintiffs are not entitled to seek injunctive or declaratory relief.  Contrary to Defendant's argument, courts have consistently held that such relief is available to named plaintiffs in class actions.  *See* Parts IV.C & D below.

All of Defendant's remaining arguments simply rehash its prior position that Starion did not substantively breach the terms of its service agreements.  However, as this Court already

---

[2]  All following references to "¶__" herein are to paragraphs in the SAC unless otherwise specified.

[3]  Plaintiffs note that the Court at the April 7 hearing did not determine that a separate Massachusetts plaintiff was necessarily required.  Rather, the court withheld decision on that issue, given that it would become moot if a Massachusetts plaintiff were added to the Complaint. *See* Mot. Tr. at 41:20-22.  As the SAC includes a Massachusetts plaintiff, the underlying question of whether plaintiff in one state cannot represent a class including residents of another state need not be resolved.  However, should this Court conclude that either Gruber or Ferdinand lacks standing to pursue her claims, Plaintiffs respectfully submit that either one could adequately represent the consumers of both states, for all of the reasons set forth in Plaintiffs' Opposition to Defendant's motion to dismiss the initial Complaint [ECF No. 33] ("Pl. Opp.") at 20-22.

concluded, Defendant is wrong.  Defendant's arguments are contrary to both the plain meaning

of the contract and logic.  Defendant's representation that its variable price would "reflect the

cost of electricity obtained from all sources" and / or would be "based on market conditions"

(which *is* the wholesale cost of electricity) cannot be read to give it the authority to charge

markups of nearly 600% (that are completely unrelated to Defendant's variable costs), or the

right to inflate prices before, and much more rapidly than, wholesale costs rise, or to maintain

those inflated prices even when its costs go ***down***.  As discussed at the April 7 hearing and

further addressed below (at Parts II.B and IV.A & B), such conduct not only violates the contract

and consumer law protections against deceptive and unfair practices, but, if Defendant's "we can

charge what we want" theory were correct, its "contract" with consumers would be utterly

illusory, and therefore void.

 Accordingly, Plaintiffs respectfully requests that Defendant's Motion to Dismiss be

denied in full.

## II. BACKGROUND AND COUNTERSTATEMENT OF FACTS

### A. Defendant's Business Model

 Plaintiffs' SAC alleges the same misconduct by Starion as alleged in the initial

Complaint.  In sum, Starion – a company that neither makes nor delivers electricity – plays a

price brokerage middleman role between ISO New England and end-users.  ¶¶17-19.[4]  All of the

elements involved in generating electricity and delivering it to consumers are handled by other

parties, and Starion plays no role whatsoever in any generation, transmission, or distribution

functions.  ¶¶18-19.  Starion simply buys the same energy, generated by the same companies,

---

[4]  A more detailed recounting of the structure of the electricity industry in Connecticut and Massachusetts was previously set forth in Pl. Opp. [ECF No. 33] at 2-8.

from the same power "pool" run by the same exchange (ISO New England), at the same

wholesale prices, as everyone else (including the local regulated utility companies), and simply

resells that same energy to consumers.  *Id.*[5]  To a consumer, there is absolutely no difference in

***product or service*** regardless of which energy "supplier" he or she selects; the only difference to

the consumer is the price he or she will be charged for the electricity.

Starion enters into variable rate contracts that provide for variable rates that are related to

underlying wholesale power costs.   ¶¶4, 21, 23-29.  For example, Starion's "Sales Agreement

for Purchase of Electricity" in force during at least part of the Class Period in both Connecticut

and Massachusetts (and that undisputedly applies to Plaintiff Ferdinand) expressly states that:

> Your variable price shall be calculated monthly ***and shall reflect the cost of***
> ***electricity*** obtained from all sources (including energy, capacity, settlement,
> ancillaries), related transmission and distribution charges and other market-related
> factors, plus all applicable taxes, fees, charges or other assessments and Starion's
> costs, expenses and margins.

¶¶26, 28 (emphasis added).[6]  Given that Starion lists its own cost of energy first and foremost in

its enumeration of factors, any reasonable consumer would understand the language in

---

[5] Defendant makes a fact-based argument that, contrary to Plaintiff's allegations, it does not buy
its electricity from ISO New England at wholesale prices, but instead purchases the electricity it
resells from yet another middleman (Emera Energy) (*see, e.g.,* Def. Mem. at 3).  But the SAC
alleges (at ¶18) that Electric Suppliers like Station "purchase power directly ***or indirectly*** from
Generation Companies." (Emphasis added.)  Because all power purchased in New England
ultimately flows through the New England ISO power pool, Emera Energy apparently purchases
power from Generation Companies through the ISO New England market and resells it to
Defendant.  *See* ¶¶17-19.  As a licensed Electric Supplier, Starion could have purchased directly
from ISO New England if it wanted.  The fact that Starion instead chose to add an additional
middleman, thereby potentially adding price inefficiencies, does not affect Plaintiffs' claims.
Starion may have had valid reasons for purchasing power through Emera Energy rather than
directly from ISO New England, but if that choice resulted in Starion paying higher prices for
electricity, Plaintiffs and consumers should not be penalized for Starion's gamble.

[6]  The SAC alleges the Total Wholesale Rate, including all energy, capacity, settlement, ancillary
and similar charges.  ¶31 n.1.  Accordingly, the wholesale costs alleged in the SAC incorporate
the additional costs associated with purchasing power from the New England power grid.

Defendant's contract to mean that its variable rate bears some relationship to the wholesale market for energy – that is, the price (or "cost") that Starion pays for power.  ¶29.

Similarly, Defendant specifically represented as part of its legally-mandated telephonic disclosures to Gruber before her account became active, and Gruber confirmed her understanding, that the variable rate would "change **based on market conditions**" (with no other factors enumerated at all). ¶27; *see* [ECF No. 55 at page 94 of 98] (emphasis added).[7]  Indeed, "market conditions" was the **only** factor disclosed to Gruber (and presumably other consumers) as affecting Starion's variable price **at all**.

The "market condition" and "cost of electricity" are straightforward and simple to quantify.  Starion simply contracts for its power through ISO New England at ISO New England's wholesale rate.  ¶¶16-19.  Indeed, because Starion buys (or could buy; *see* note 5 above) all of its electricity from the New England power pool at the wholesale price set by ISO New England, the wholesale cost is the only electricity cost Starion could have.

Although Defendant may include "costs" and "expenses" in its variable price, Starion, as noted above, does not have any operating expenses relating to the actual delivery of electricity.  All of its costs beyond the wholesale cost of electricity are simply common business expenses – such as overhead, advertising, or employee costs – and are relatively fixed.  ¶¶18, 34-35.[8]  These

---

[7]  Although the Connecticut terms of service in effect at the time that Gruber contracted with Starion simply noted that Starion's variable rate would be calculated "based on a Station variable price methodology," the telephone confirmation pinpoints exactly what that "variable price methodology" was.  This understanding is further confirmed by the fact that Starion's *subsequent* Connecticut contract states that the variable rate "shall reflect the cost of electricity obtained from all sources" (as set forth above), while the *preceding* form contract in effect before Plaintiff signed-up with Starion described Starion's pricing methodology as follows: "[w]e may increase or decrease your rate each month to reflect changes in our cost of procuring your electricity supplies **in the wholesale power market**."  [ECF No. 30-3 at page 9 of 9 (emphasis added).]

[8]  Indeed, Defendant itself identifies its "operational costs" as "including renewable energy certificates, overheard, computers, office space, sales, marketing salaries, commission, cost of

relatively fixed costs could not remotely justify Starion's massive price increases.  Moreover, these discrete fixed costs do not sever the variable price's fundamental contractual link to the wholesale rate, which is the only variable cost Starion could have.

Starion's representation that its variable price also includes a reasonable profit "margin" is not a "get out of jail free" card: Starion is still required, pursuant to its contractual representations, to charge a variable price that is correlated to the underlying wholesale "market" power rate.  In breach of this requirement, Starion gouges consumers.  For example, during the period from August 2013 through March 2015, Starion's Connecticut variable rates were up to *six* times higher than its contemporaneous electricity costs.  ¶31.  Notably, Starion ***increased*** its maximum variable rate in advance of a brief spike in wholesale prices from December through March in the 2013-14 and 2014-15 winters – and then failed to ***decrease*** its maximum variable rate when the wholesale price dropped precipitously with more moderate temperatures:



collateral, licensing; regulatory costs; and legal costs, etc" (Def. Mem. at 3), all of which are relatively fixed.  At a minimum, this question cannot be resolved on a motion to dismiss.

¶32.  Indeed, even as the average wholesale price for electricity declined by approximately 78% during the period from January to May of 2014 (and then remained relatively until December 2014), Starion maintained its inflated rate through at least March 2015, giving Starion a price premium of as much as ***583%***.  ¶38.

The fact that Starion's variable rates were ***not***, contrary to Defendant's representations, based upon "market rates" is confirmed by new allegations in the SAC concerning tremendous disparities in the variable rates Starion simultaneously charged to different customers.  For example, Starion's filing demonstrates that its lowest variable rate for the period October 2013 through October 2014 was consistently 6.9 cents. Starion's highest variable rate during the same period ranged from 18.9 cents to 21.9 cents, triple the lowest rate. ¶36; *see also* ¶37.  Yet both rates were purportedly based on the same "market conditions."   Given that there is only one market, Starion had to be overcharging its customer.

### B.    Additional Factual Allegations in the SAC Concerning Plaintiffs' Standing

As directed by this Court at the April 7 hearing, the SAC both adds a plaintiff from Massachusetts (Ferdinand) and provides detail concerning the damages both Plaintiffs suffered.

#### 1.  Plaintiff Lydia Gruber

##### a.  Plaintiff Gruber Has Standing to Bring Claims on Behalf of a Connecticut Class

As noted above, Gruber's automated telephonic confirmation call from Starion confirmed that her price would be "based on market conditions."  ¶27.  Gruber was on Starion's variable rate plan from August 2013 through January 2014.  *See* ¶39.[9]  During this period, the rates paid

---

[9]  In the SAC, Plaintiffs inadvertently misstated that Gruber joined Starion's variable rate plan in October 2013.  *See* ¶39.  Contrary to Defendant's insinuation ("for reasons that remain unknown, Gruber fails to attach her bills as an exhibit to the SAC") (Def. Mem. at 7 n.5), this was simply a pleading error.

by Gruber were unrelated to, and consistently and substantially in excess of, the wholesale price of power.  ¶40.  For example, on October 12, 2013, Plaintiff's rate jumped from 7.37 cents in September to 8.25 cents per kwh, an increase of 12%.  ¶41.  Yet during that same period, the Total Wholesale Rate dropped from 3.828 cents to 3.451 cents per kwh, a ***decline*** of 10%.  *Id.* Similarly, on November 13, 2013, Plaintiff's rate increased from 8.25 cents to 13.99 cents per kwh, an increase of 70%, yet the Total Wholesale Rate increased only from 3.451 cents to 4.468 cents per kwh, an increase of only 23%.  *Id.*  Moreover, the spread between the Total Wholesale Rate and Plaintiff's rate increased over 2 ½ times, from 3.542 cents in September (7.37 minus 3.828) to 9.522 cents in December (13.99 minus 8.801).  *Id.*  Given that Starion's other expenses were relatively fixed (¶¶18, 34-35), there is no market condition that could justify Gruber's increases.  Accordingly, Plaintiff Gruber suffered an ascertainable loss in that she paid more than she should have for power.

### b.  Defendant's Factual Challenges to Gruber's Standing are Without Merit

Defendant's argument that Gruber "relies upon, and quotes from, a terms of service that does not apply to her" is without merit.  Defendant notes that the specific contract quoted in the SAC (at ¶26) postdates the end of Gruber's contract.  Def. Mem. at 8-9.  However, as discussed during the April 7 hearing, Defendant's argument is immaterial because, as set forth above, it is undisputed that Defendant *did* represent to Gruber that her variable rate would be based on "market conditions."[10]

The contract cited by Defendant as the "Gruber TOS" (*see* Def. Mem. at 8-9 and Exhibit H thereto) states that the variable rate "will be calculated based on a Starion variable price

---

[10] Moreover, the Court appears to have already rejected this argument when it sustained Gruber's fundamental misrepresentation claim, pending only further allegations demonstrating her personal damages and thus standing.  Mot. Tr. at 41:7-42:8.

methodology."  Starion specifically explained its "variable price methodology" to Gruber in its

legally-mandated verification call, in which, as Defendant concedes, Starion stated that Gruber's

variable rate would "change based on market conditions" (with no other considerations even

mentioned).  ¶27; *see* Def. Mem. at 9.  Accordingly, there is no dispute that Starion made the

representation at issue to Gruber prior to the start of her contract.  Moreover, contrary to

Defendant's argument that "market conditions" does not refer to Starion's wholesale cost for

power (Def. Mem. at 9), that is *precisely* what a reasonable consumer would understand and

expect, as discussed at Part II.A above.[11]

   Defendant's argument that Gruber does not "plausibly plead" injury given the variable

rates she personally paid (Def. Mem. at 11-13) is equally without merit.  Indeed, Defendant's

Graph I itself demonstrates that Starion's variable rate increased significantly despite a much

more limited rise in its underlying costs.  *See* Table II, Graph I.[12]  The new Table II demonstrates

that between September 1 and November 1, 2013, Starion's average cost for electricity (by its

own metric for "average cost") increased from $0.03828 to $0.04468 per kWh, only 17% (and

---

[11] Perhaps recognizing this fact, Defendant in its opening memorandum in support of its motion to dismiss did not dispute Plaintiff Gruber's allegation that Starion's contract ties its variable rate to market conditions.  *See generally* Defendant's Memorandum of Law in Support of Motion to Dismiss the initial Complaint [ECF No 30-7].  Indeed, as revealed by Defendant's own attachments to its prior motion to dismiss briefing, the form contract in effect ***before*** Plaintiff signed-up with Starion described Starion's pricing methodology as follows: "[w]e may increase or decrease your rate each month to reflect changes in our cost of procuring your electricity supplies ***in the wholesale power market***."  *See* [ECF No. 30-3 at page 9 of 9 (emphasis added).]  Accordingly, Defendant consistently represented before, during, and after Gruber's contract period that Starion's variable pricing methodology is linked to its underlying wholesale costs, and Defendant's reference in the Gruber TOS to its "variable price methodology" must be read in light of that fundamental reality.  At a minimum, and especially given the undisputed representation in Starion's phone verification of Gruber's variable rate contract, this issue is not amenable to resolution on a motion to dismiss.

[12] As an initial matter, Defendant's data goes beyond the four corners of the SAC.  For example, it uses "day ahead" rates to represent Starion's costs, whereas the SAC uses the Total Wholesale Rate.  *Compare* Def. Mem. at 12 *with* SAC at ¶31 and n.1.  Nonetheless Plaintiffs address Defendant's new data herein.

9

roughly half a cent).  During the same period, the rate that Starion charged Plaintiff increased

from $0.0737 to $0.1399 per kWh, which is a ***90%*** increase (and over six-and-a-half cents).

Accordingly, Defendant's new data in fact confirms what Gruber alleges: that Defendant charged

her variable rates unmoored from Starion's own costs, but rather set purely as a profit center.[13]

   Defendant also argues that Plaintiffs' calculation of wholesale rates fails to account for

various costs, including transmission losses and "many other costs."  Def. Mem. at 12.

However, Defendant fails to specify what those "costs" are, and, indeed, any such argument

would be improper in the context of a motion to dismiss.  In any event, wholesale costs are based

on the Total Wholesale Rate, including grid-related charges.  ¶31, n.1.  Transmission losses (the

amount of power lost transporting electricity from generator to customer) are quite small.

Plaintiffs' understanding (both from documents their counsel have reviewed and from their

retained expert) is that any such costs are minor and would not substantially impact the

discrepancy between Starion's wholesale costs and the variable rates it charged Gruber (and

other Class Members).  Moreover, these costs are relatively fixed and cannot justify price

variances because they are tied to the quantity of power distributed, not the wholesale price of

power.  More important, these issues can only be resolved based upon a full factual record, rather

than, as Defendant seeks, in the context of its motion to dismiss.[14]

---

[13]  Defendant also argues that Plaintiffs' allegations (at ¶¶30-33) concerning the maximum
variable rates charged in Connecticut are irrelevant.  *See* Def. Mem. at 10-11.  However, as an
initial matter, those allegations both illustrate the scope of Defendant's misconduct and will
certainly be relevant to class certification.  In any event, the fact that Gruber herself did not pay
those rates is itself moot and has no bearing on her claim, as Plaintiff's allegations concerning
the rates she paid also state a claim, as discussed above.

[14]  Defendant's argument that the SAC misstates the rates charged by CL&P (Def. Mem. at 10)
misunderstands the nature of Plaintiffs' allegations.  Plaintiffs allege at ¶34, n.3 of the SAC that
CL&P charges on 6.7 cents per kilowatt hour (plus a flat $19.25 charge) "***for distribution
services***" (emphasis added), a completely different and separately billed service provided by
CL&P.  Plaintiffs' point is that Starion's markup merely for ***brokering*** electricity is "several

### 2.  Plaintiff Louise Ferdinand

#### a.  Plaintiff Ferdinand Has Standing to Bring Claims on Behalf of a Massachusetts Class

Ferdinand's Sales Agreement with Starion provided that her variable price would "reflect the cost of electricity."  ¶28.  Ferdinand was on Starion's variable rate plan from November 2014 through March 2015.  ¶43. From November 19 to December 18, 2014, Plaintiff's rate was 7.59 cents, and the November Total Wholesale Rate for Northeastern Massachusetts was 5.236 cents. Accordingly, Starion charged 2.354 cents above the Total Wholesale Rate.  ¶44.  Similarly, from December 18, 2014 to January 21, 2015, Starion charged 2.24 cents above the Total Wholesale Rate, as Plaintiff's rate was 7.59 cents, and the December Total Wholesale Rate was 5.35 cents. ¶45.  From January 21, 2015 to February 23, 2015, Plaintiff's rate was 7.99 cents, and the January NE Massachusetts Total Wholesale Rate was 7.535 cents. Accordingly, Starion charged 0.45 cents above the Total Wholesale Rate.  ¶46.  Then, from February 23 to March 20, 2015, Plaintiff's rate tripled to 21.47 cents, but the February Total Wholesale Rate was 13.784 cents. Accordingly, during that month, Starion charged a spread of *7.786* cents above the Total Wholesale Rate, more than triple the spread Starion charged Ferdinand from mid-November, 2014 to mid-January 2015.  *Id.*  Even when combining the diminished spread in January and February, Starion charged Ferdinand an average spread for the mid-January to mid-March 2015 period of 4.118 cents, almost double the spread charged in 2014 and the first couple of weeks of 2015.

---

multiples" of what CL&P charges for actually ***delivering*** the electricity (*i.e.,* providing a service).  *See* ¶34.  Plaintiffs are ***not*** alleging, as Defendant apparently understood, that CL&P charges 6.7 cents for ***supplying*** electricity, when it acts in its separate capacity as electric supplier.

**b. Defendant's Factual Challenges to Ferdinand's Standing are Without Merit**

Defendant's argument that Ferdinand lacks standing because she purportedly "saved money as a Starion customer" (Def. Mem. at 4, 5-6) is without merit. Starion claims that Ferdinand did not suffer injury from Starion's breach of its Agreement because she would have done even worse as a customer of National Grid (the Massachusetts regulated electric utility) during the period of her Starion contract. However, the amount of money Ferdinand may or may not have spent or saved as a National Grid customer is irrelevant: rather than remain with National Grid, Ferdinand chose to contract with Defendant. Accordingly, she had the right to expect Starion to abide by the promises in its contract *regardless* of National Grid's contemporaneous rates, and was damaged when Starion overbilled her in excess of what her contract provided, as set forth above. Thus, Ferdinand's damages are the difference between the amount Starion charged and the amount Starion should have charged, regardless of the amount that National Grid might have charged if Ferdinand had been its customer.

Moreover, Defendant's own figures in its Table I (Def. Mem at 6) illustrate that, at a minimum, Defendant improperly overcharged Ferdinand in the last month of her contract. As discussed above (and at ¶46), the variable rate that Starion charged Ferdinand jumped from a $0.0759 "teaser rate" period of her contract to $0.2147 in the final month before she cancelled. During those first three "teaser" months (when Starion was trying to establish goodwill with its new customer), her variable rate was at most 2.2 cents above the wholesale rate; however, in the last month, it charged over 7 cents above its wholesale cost (and, as noted above, its spread over is wholesale cost also increased tremendously). Even assuming that the variable rates Starion charged in the first three months properly reflected the wholesale market price, the question of whether the rate when the teaser rate ended (at which point Starion's variable rate greatly

12

exceeded National Grid's variable rate) also was proper, or whether it caused Ferdinand to suffer

damages, cannot be resolved on a motion to dismiss.

## III.   STANDARD OF REVIEW

On a motion to dismiss, the court must "accept all factual allegations in the complaint as

true and draw inferences from those allegations in the light most favorable to the plaintiff."

*Jaghory v. N.Y. State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir. 1997).  A complaint should be

sustained so long as it contains "enough facts to state a claim to relief that is plausible on its

face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plaintiff only needs to

plead "factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Koenig v.*

*Boulder Brands, Inc.,* No. 13-CV-1186(ER), 2014 WL 349706, at *6 (S.D.N.Y. Jan. 31, 2014).

## IV.   ARGUMENT

### A.   Plaintiffs State A Statutory Consumer Protection Claim

#### 1.   Starion Engaged in Misleading or Deceptive Acts or Practices Under Both Connecticut and Massachusetts Law

Plaintiffs' "misleading or deceptive acts" claim is straightforward under both the

Connecticut Unfair Trade Practices Act ("CUTPA") and the Massachusetts Regulation of

Business Practices for Consumers' Protection Act ("MCPA"): Defendant falsely or misleadingly

represents that its variable electric rates are based upon the "cost of electricity" and "market

conditions," when in fact they are not.[15]  ¶¶23-38, 58-65.  A reasonable consumer would

---

[15]  As this Court (Hall, J.) has recognized, the substantive elements of CUTPA and MCPA
claims are materially identical.  *See Country Club Assocs. v. Shaw's Supermarkets, Inc.,* 643 F.
Supp. 2d 243, 253-55 (D. Conn. 2009) (declining to reopen judgment under CUTPA because,
even if court should have required plaintiff to plead under MCPA rather than proceeding under
CUTPA, the result would have been the same "[b]ecause Massachusetts does regulate trade
practices in an analogous manner to Connecticut").  Indeed, Defendant essentially concedes as

understand Defendant's representations to mean that the variable rate ***charged*** by Defendant and

the wholesale electricity prices ***paid*** by Defendant are correlated such that variable rates would

increase only as wholesale prices rise, and would also decrease commensurately when wholesale

prices fall.  ¶¶29, 62.[16]

However, that is not Defendant's practice.  In fact, as discussed above, Defendant

charges exorbitant prices well in excess of its costs, increases prices (without valid reason)

before and much more rapidly than wholesale costs increase, and maintains those inflated prices

when wholesale prices drop, even though it has no other market costs and all of its standard

business costs are relatively fixed.  Accordingly, Plaintiffs have stated a claim.

### a. Defendant's Argument That Its Connecticut Conduct Does Not Amount to a Deceptive Act or Practice Under CUTPA Is Without Merit

Defendant's sole argument that it did not engage in a deceptive act or practice under

CUPTA with regard to Gruber is premised on its (incorrect) argument that it never represented

that its variable rate would correlate to its wholesale power costs.  *See* Def. Mem. at 26-28.

Defendant completely ignores the statutorily mandated telephonic confirmation, in which Starion

specifically represented, and Gruber confirmed her understanding, that Starion's variable rate

---

much.  Def. Mem. at 17-18 (listing elements of claim under MCPA, which are substantively
identical to CUTPA claim; *see also* Part IV.A.2 *infra*).

[16]  Defendant's reliance upon *Caldor v. Heslin,* 577 A.2d 1009 (Conn. 1990) and *Lord v. Int'l
Marine Ins. Servs.,* No. 08-cv-1299(JCH), 2013 WL 5346507 (D. Conn. Sept. 23, 2013) (Def.
Mem. at 26) is puzzling.  Plaintiffs do not dispute that these cases articulate the correct standard
for pleading a deceptive acts or practices claim under CUTPA.  However, neither of these cases
support dismissal of Plaintiffs' claim here.  The *Lord* court simply concluded, on summary
judgment, that there was "no basis on which a reasonable jury could find deception" when the
uncontroverted facts demonstrated that although the defendant had at some point cancelled a
check that plaintiff had failed to cash for over four years, defendant issued a replacement check
within two months of plaintiff's request.  *Id.* at *7.   *Caldor* does not directly address a consumer
dispute at all, but rather involved a challenge by a retail chain to the authority of the Connecticut
Department of Consumer Protection to issue certain regulations.  Both of these cases are simply
irrelevant to the sufficiency of Plaintiffs' detailed allegations of deceptive conduct here.

would be "based on market conditions" (with no other factors listed).  ¶27.  This by itself
constitutes a deceptive act or practice under CUTPA.

Rather than acknowledge the significance (or existence) of the telephone confirmation,
Starion instead argues only that Gruber misstates the contract applicable to her.  However, as
discussed above (note 5 and associated text), Gruber's contract represents that her variable rate
will be calculated "based on a Starion variable price methodology."  Given Starion's express
representation during the phone confirmation, it is clear that Starion's "variable price
methodology" (as referenced in the contract) *is* that the variable price will follow "market
conditions."  *See* Part II.A above.  Moreover, as also discussed above, Plaintiffs specifically
allege that Starion has no other variable costs other than its wholesale cost of power that could
change with "market conditions" (and thereby cause the variable rate it charges Gruber and other
customers to fluctuate).  *Id;* ¶¶18, 34-35.  Accordingly, Starion misrepresented to Gruber (and
other Connecticut consumers) that its variable rates would be tied to Starion's wholesale power
costs – when in fact they were not.[17]

Contrary to Defendant's argument (Def. Mem. at 28-30), *Zahn v. North American Power
& Gas LLC,* No. 14 C 8370, 2015 WL 2455125 (N.D. Ill. May 22, 2015) does not support
dismissal of Plaintiff's CUTPA claim.  As an initial matter, the *Zahn* court dismissed Ms. Zahn's
claims against North American Power ("NAP") (an electric supplier with a similar business
model as Defendant here) based on its conclusion that the Illinois Commerce Commission had

---

[17]  Defendant's attempt (Def. Mem. at 28) to distinguish *Yang Chen v. Hiko Energy,* Nos. 14-cv-
1771(VB), 14-cv-2042(VB), 2014 WL 7389011, at *4-6 (S.D.N.Y. Dec. 29, 2014), is without
merit.  Defendant focuses on the fact that the contract at issue in *Yang Chen* specifically stated
that the defendant's variable rate would "reflect the wholesale cost of electricity," whereas
Starion's contract here does not use those precise words.  However, as discussed above, that is
the precise message that Starion intended to – and did – send to consumers.  *See* ¶¶29, 62.
Accordingly, the *Yang Chen* court's conclusions are equally applicable here.

exclusive jurisdiction over her rate claims.  *Id.* at *3.  However, Defendant has *not* raised an

"exclusive agency jurisdiction" argument in its Motion to Dismiss in the present litigation.[18]

Accordingly, *Zahn* has little bearing on this case; although the *Zahn* court also discusses NAP's

contract language, that analysis is purely *dicta*.  *See id*. at *3-5.

   In any event, *Zahn* is readily distinguishable.  First, Zahn's **own** evidence demonstrated

that, contrary to her fundamental claim, NAP's variable price **did** substantially follow the

underlying wholesale price of electricity.  *See Zahn* at *1 ("A graph of electricity prices during

the relevant time period include[ed] in the Complaint shows that the NAPG price varied in rough

proportion to the average wholesale price.")  Accordingly, the *Zahn* court logically concluded (in

dicta, as noted above) that Ms. Zahn failed to allege any deceptive practice or breach of contract

by NAPG.  *Id.* at *3-5.  Here, Starion increased its rates (without reason) before and much more

rapidly and substantially than its wholesale costs increased, and failed to decrease its prices in

response to a falling wholesale market price.  ¶¶31-38; *see also* Parts II.A & B above.   In other

words, unlike in *Zahn* (where the facts alleged by plaintiff undercut her legal theory), Plaintiff's

factual allegations fully support her claims.

   Second, the *Zahn* court found that plaintiff failed to adequately allege that variations in

NAP's variable price were *not* caused by the various factors specifically listed in the NAP

Illinois terms of service.  *See Zahn* at *3-4.  The opposite is true here, as Plaintiff clearly alleges

that Defendant's price increases were not based either on Starion's costs or on business or

market conditions.   ¶¶30-38.  As discussed above (at Part II.A), all of Defendant's "business"

---

[18]  Although Defendant has argued that the Connecticut and Massachusetts public utility
regulatory authorities approved Defendant's contracts, and therefore that the terms of the
contract *ipso facto* could not violate CUTPA or the MCPA (*see, e.g.,* Def. Mem. at 19-20, 31-
32), Defendant has *not* raised an exclusive jurisdiction argument of the type relied upon in *Zahn*.
Moreover, Defendant's argument concerning regulatory approval of its contracts is factually
incorrect, as set forth at Part IV.A.2.a below.

costs are common, relatively fixed business expenses such as overhead, advertising, or employee costs that cannot justify any changes in the price Defendant charged.  ¶¶18, 34-35.  Similarly, the only relevant market condition is the wholesale cost of power, and these underlying wholesale power costs do not remotely justify Starion' rate increases, or the maintenance of those rates. ¶¶31-32.  36-38, 39-47.  Accordingly, unlike in *Zahn*, Plaintiff has properly pled that Starion's rates improperly rose.  Indeed, the only reasonable inference that can be drawn from Defendant's price increases is price gouging.

### b.  Plaintiff Gruber Has Pled Her Fraud-Based CUTPA Claim With The Particularity Required Under Fed. R. Civ. P. 9(b)

Defendant's argument that Plaintiff Gruber has failed to allege Starion's deceptive conduct with the specificity required under Fed. R. Civ. P. 9(b) (Def. Mem. at 35-38) is without merit.[19]  Under Fed. R. Civ. P. 9(b), the complaint need only "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Wood ex rel. U.S. v. Applied Research Assocs., Inc.,* 328 F. Appx. 744, 747 (2d Cir. 2009).  "The purpose of Rule 9(b) is threefold – it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."  *Id.*

Here, Plaintiff Gruber has fully satisfied the requirements of Rule 9(b).  Plaintiff alleges the specific misrepresentation at issue: Starion's claim that its variable price is based on market conditions.  ¶¶4, 26-28.  The speaker was Defendant, and Defendant made the misrepresentations both in its undisputed phone confirmation to Gruber and in Gruber's contract.  *Id*.  Accordingly,

---

[19] Defendant does *not* raise a similar argument with respect to Plaintiff Ferdinand's claims under the MCPA.

Defendant's argument that "the SAC does not identify . . . the specific contract or representation that Gruber challenges as being deceptive, false and/or misleading" (Def. Mem. at 36-37) is simply incorrect.  Finally, as discussed at length above (*see* Parts II.A & B), Plaintiff explains why Defendant's statement was misleading: because Defendant's variable prices are not remotely tied to market conditions, but instead are a profit center completely divorced from Starion's costs.  ¶¶30-47.  Accordingly, Defendant cannot legitimately argue that it does not have "fair notice of plaintiff's claim" to allow it to defend itself, or that Plaintiff is engaged in a baseless "strike suit" that serves only to damage Starion's reputation.

Defendant also complains that Plaintiff does not identify, presumably by precise date, exactly "when Plaintiff viewed the purportedly deceptive" material, which Defendant argues is a fatal flaw because Plaintiff must have seen such representations "***before*** enrolling with Starion." Def. Mem. at 37 (emphasis in original).  But as Plaintiff pleads, and Defendant does not dispute, the language constituting the alleged misrepresentation is, at a minimum, in Starion's own automated phone confirmation to Gruber (as referenced in her contract documents).  ¶27. Unless Defendant is arguing that it did not provide Plaintiff with all the terms and conditions of her contract before the contract was formed – which would violate both Connecticut and Massachusetts law[20] – Defendant's purported confusion over which representations Plaintiff relied upon, and when she relied upon them, is nonsensical.

The cases relied upon by Defendant are readily distinguishable because, unlike here, plaintiffs in those cases did not provide even the most basic information concerning the alleged

---

[20]  See, e.g., Conn. Gen. Stat. §16-2450(f)(1) ("each electric supplier shall prior to the initiation of electric generations services, provide the potential residential customer with a written notice describing the rates"); 220 CMR §11.06(4)(a) ("*Prior to Initiation of Service by a Competitive Supplier*.  Following a Retail Customer's affirmative choice of a Competitive Supplier, the Competitive Supplier shall provide the Retail Customer with . . . the Terms of Service").

fraud.  For example, in *E. Point Sys., Inc. v. Maxim,* No. 13-cv-00215 (VLB), 2014 WL 523632

(D. Conn. Feb. 7, 2014) (Def. Mem. at 35), the court concluded that the counter-claimant "failed

to identify who actually made the statements, when the statements were made, and to whom they

were made." *Id.* at *6.  Likewise, in *In re Trilegiant Corp., Inc.,* 11 F. Supp. 3d 82 (D. Conn.

2014), the court simply held that plaintiff failed to provide any detail concerning the alleged

"mail or wire" fraud in connection with plaintiff's RICO fraud claim or substantiating plaintiff's

allegation that the defendant's data sharing practices were somehow "inherently" harmful.  And

in *NCC Sunday Inserts, Inc. v. World Color Press, Inc.,* 692 F. Supp. 327, 329-30 (D. Conn.

1988), the complaint "fail[ed] to state precisely what statements were made, to whom they were

made [or] in what documents the statements were contained."  Here, Plaintiff has alleged in

detail that Defendant, in it is contract and telephone confirmation, made the relevant

(mis)representations to Plaintiff, and that Plaintiff and the Class were substantially harmed

thereby.  *See* Parts II.A & B above.[21]

### c. Defendant's Argument That Its Massachusetts Conduct Does Not Amount to a Deceptive Act or Practice Under the MCPA is Without Merit

Defendant's arguments in favor of dismissal of Ferdinand's "deceptive acts or practice"

claim under the MCPA are similarly baseless.  First, relying solely upon its (faulty) analysis of

---

[21] Likewise, in *L.S. v. Webloyalty.com, Inc.,* No. 10-cv-1372 (CSH), 2014 WL 3547640 (D. Conn. July 17, 2014), when the plaintiff purchased a video game at an online store, he was also (unwittingly, according to him) enrolled in a "membership club" that automatically charged his credit card each month.  *Id.* at *1.  However, his complaint appears to have failed to set forth any of the details of his contract with the club, or any indication of how the relationship came to be. *See generally id.* at *7.  Rather, the *L.S.* plaintiff simply asserted that he did not intend to enter or authorize any relationship with the club.  *Id.*  Under these circumstances, the court concluded that the plaintiff had failed to "state with particularity" how his contract with the club began.  *Id.* Here, there is no question that Plaintiff and Starion entered a contract.  Moreover, Plaintiff specifically alleges the objectionable representations in that contract, and her reliance thereon. ¶¶24-25, 35.  Accordingly, none of the infirmities identified by the *L.S.* court are present in this case.

Ferdinand's bills, Defendant asserts that Ferdinand did not suffer an "ascertainable loss." Def. Mem. at 18.  Defendant is wrong.  *See* Part II.B.2 above.

Starion also asserts that its contract with Ferdinand was not deceptive, and that Ferdinand could not have expected her variable rates to reflect Starion's underlying power costs, because "the phrase 'wholesale cost of electricity' does not appear anywhere within the four corners of the document."  Def. Mem. at 20-22.  However, as discussed above, Defendant's representation that its variable rate would "reflect the cost of electricity obtained from all sources" constitutes exactly such a representation because Defendant's only electricity cost *is* the wholesale cost.  *See* Part II.A above.

Defendant's reliance on *Tello v. Bank of Am. N.A.,* No. 12-cv-01040-GMN-NJK, 2014 WL 99299 (D. Nev. Jan. 3, 2014) (*see, e.g.,* Def. Mem. at 21) is misplaced.  Although the *Tello* court's factual recitation is quite brief, it appears that the plaintiff alleged that defendants had "falsely represented to him than [his] original loan would be 'cancelled/discharged/satisfied' upon refinancing," when in fact the new loan agreement did not so provide.  *Id.* at *3.  However, the court found, based upon the undisputed loan agreement that plaintiff attached to his complaint, that the new loan documents *did* "resolve his obligations under the original loan."  *Id.* at *4.  Unsurprisingly, the court then concluded that plaintiff had failed to state a claim for intentional misrepresentation.  *Id.*  Likewise, the court in *Saravia v. Select Portfolio Servicing, Inc.,* No. 13-cv-01921-RDB, 2014 WL 2865798 (D. Md. June 23, 2014) (Def. Mem. at 8, 10) simply concluded that the *pro se* plaintiff had made allegations that were internally and directly

contradictory regarding what he had been told by defendant concerning his loan modification

request, and so had failed to state any coherent fraud claim whatsoever. *Id.* at *7.[22]

### 2. Starion Engaged in Unfair Acts or Practices Under Both Connecticut and Massachusetts Law

Plaintiffs have also pled that Defendant's pricing constituted "unfair" conduct under

CUTPA and MCPA. As Defendant acknowledges (*see* Def. Mem. at 26), a CUTPA "unfairness"

claim is governed by the "cigarette rule," which entails an analysis of:

> (1) [W]hether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the common
> law, or otherwise—in other words, it is within at least the penumbra of some
> common law, statutory, or other established concept of unfairness; (2) whether it
> is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes
> substantial injury to consumers . . . .

*Ventres v. Goodspeed Airport, LLC,* 275 Conn. 105, 155 (2005). A practice can be "unfair"

because it violates all three prongs of the "cigarette rule" to a limited extent *or* because it violates

just one of the prongs to a greater extent. *Id.* Massachusetts law similarly follows the "cigarette

rule" and provides that "[a] practice is unfair if it is within the penumbra of some common-law,

statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or

unscrupulous; and causes substantial injury." *Linkage Corp. v. Trustees of Boston Univ.,* 679

N.E.2d 191, 209 (Mass. 1997); *see* Def. Mem. at 17. Here, Plaintiffs have satisfied all three

prongs of the Connecticut and Massachusetts "unfairness" standard.

---

[22] Defendant cites a handful of additional cases to support its proposition that "the clear terms of
the Ferdinand TOS refute Ferdinand's contention that Starion represented that the price for
electricity under her variable rate plan was tied to the wholesale price of electricity." Def. Mem.
at 21-22. However, none of the cases cited by Defendant address contracts or alleged
misrepresentations even remotely similar to the language at issue here. *See James L. Turkle
Trust v. Wells Fargo & Co.,* 602 Fed. Appx. 360 (9th Cir. 2015) (trust preferred securities
agreement); *Aspinall v. Phillip Morris Cos., Inc.,* 813 N.E.2d 476 (Mass. 2004) ("light"
representation on cigarettes); *Int'l Fid. Ins. Co. v. Wilson*, 443 N.E.2d 1308 (Mass. 1983) (surety
performance bond).

### a.  Defendant's Actions Offend Public Policy

The first prong of the "cigarette rule" concerns whether the challenged practice violates public policy.  Here, Plaintiffs specifically plead that Defendant's contracts "do not accurately describe the rates the consumer will be paying or the circumstances under which the rates may change."  ¶61.  This blatant failure, on its own, is sufficient since CUTPA and the MCPA themselves embody a public policy against lying to consumers.  Moreover, statutory and regulatory policy in Connecticut and Massachusetts require Electric Supplier contracts to explain "the circumstances under which . . . rates may change" (Connecticut), and specifically make it an "unfair or deceptive act or practice" to "mislead a reasonable consumer" about the "total delivered price of electricity" (Massachusetts).[23]  Here, Defendant misrepresents the circumstances under which rates change because the rate changes are not remotely related to electricity costs or changes in the market but instead are based solely on Defendant's greed.  Moreover, Defendant misleads a reasonable consumer about the "total delivered price of electricity."

Defendant does **not** dispute that a misrepresentation in a contract would violate public policy.  Rather, Defendant simply argues that Connecticut's and Massachusetts' public utility

---

[23]  For example, Conn. Gen. Stat. §16-245o(f)(2) expressly provides that "[e]ach contract for electric generation services shall contain all material terms of the agreement" including "a clear and conspicuous statement explaining the rates that such consumer will be paying" and "***the circumstances under which the rates may change***"(emphasis added).  Similarly, Massachusetts regulations state that "***[i]t is an unfair or deceptive act or practice*** for a retail seller of electricity to make any material representation to the public or to any consumer, either directly or through any type of marketing or agreement. . . .  which the seller knows or should know has the capacity or tendency to deceive or mislead a reasonable consumer . . . in any material respect, including but not limited to representations relating to . . . (d) ***any term of any agreement to be entered into by the retail seller of electricity and a consumer [for] the distribution price, the generation price or the total delivered price of electricity*** . . . ."  940 CMR §19.04 (emphasis added).  Although these Connecticut and Massachusetts provisions are law, not "facts" that need to be alleged in a Complaint, Plaintiff could easily file an amendment including them should the Court so order.

regulatory authorities (PURA and MDPU respectively) reviewed and approved Starion's consumer contracts in each state. *See* Def. Mem. at 19-20, 22-23, 31-32. Although PURA and MDPU may have accepted Defendant's service contract ***as written***, those regulatory agencies have never approved of Defendant's actual pricing ***practices***. Rather, at most, PURA and MDPU simply found that the ***terms*** set forth in Defendant's contracts ***as written*** are proper. The problem is that Defendant ***breached*** its contracts, and otherwise misled consumers about Defendant's actual practices. Neither PURA nor MDPU has never condoned such illegal conduct, or even come close to such an illogical result. Nor do PURA or MDPU review, much less approve, the rates that Starion or other electric suppliers set. ¶20.[24]

### b. Defendant's Misrepresentations Are Immoral, Unethical, Oppressive or Unscrupulous

The second prong of the "cigarette rule" concerns whether Defendant's conduct is immoral, unethical, oppressive or unscrupulous. Contrary to Defendant's argument that the SAC "does not set forth how, or in what respect," Starion breached this standard (Def. Mem. at 23, 32), Plaintiffs allege with great specificity that Defendant misrepresents that its variable prices are based on wholesale costs and market conditions, when in fact they are arbitrarily set as a profit center at levels that are wholly disconnected from wholesale power prices, and are sometimes as much as ***six times*** the actual cost of power. *See* Part II.A above. This adequately supports this prong of the cigarette rule.

---

[24] Defendant's bald assertion that *A-G Foods, Inc. v. Pepperidge Farm, Inc.,* 216 Conn. 200 (Conn. 1990), supports its argument that PURA's "approval" of Starion's contract immunizes it from liability (Def. Mem. at 32) is simply incorrect. Plaintiff does not dispute that *A-G Foods* articulates the correct standard for pleading an "unfairness" claim. However, *A-G Foods* merely held that negligent failure to supervise an employee does not constitute a CUTPA violation; it is completely irrelevant to Defendant's "PURA-approval" argument. Likewise, *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d 215, 243 (1st Cir. 2005) does not address this question at all, but rather just articulates the general standard for an "unfairness" claim in Massachusetts before reversing the district court's dismissal of such a claim.

Defendant's principal argument – that a simple breach of contract does not constitute a breach of CUTPA or the MCPA absent aggravating factors (Def. Mem. at 23-24, 32-33) – is correct as far as it goes.  However, it ignores that Plaintiffs *have* alleged sufficient aggravating circumstances here: that Defendant charged up to *six times* its actual cost for power.   In that regard, the authority upon which Defendant relies is not only factually distinguishable, but also holds that an "egregious breach" *can* give rise to a CUTPA violation.  For example, in *Halo Tech. Holdings, Inc. v. Cooper,* No. 07-cv-489 (SRU), 2010 WL 1330770 (D. Conn. March 31, 2010) (Underhill, J.), this Court found that the defendant did not engage in "immoral" conduct by breaching a non-disclosure agreement where the defendant made disclosure to parties who already had the relevant information anyway.   *Id.* at *7.  Although this Court found a lack of "aggravating factors" in that particular circumstance, the Court also noted that "[s]ignificant aggravating factors" that *can* constitute immoral conduct include "misrepresentations in formation" of a contract or "*egregious breach*."  *Id.* (emphasis added).  Here, Defendant charged exorbitant rates for power, improperly inflated its rates, and maintained those inflated rates as wholesale costs fell, wholly ignoring the language of its contract.  The remaining Connecticut[25] and Massachusetts[26] cases cited by Defendant are equally inapposite.

---

[25] In *Hart v. World Wrestling Entm't.,* No. 10-cv-0975 (SRU), 2012 WL 1233022, at *11 (D. Conn. Apr. 10, 2012) (Underhill, J.), this Court concluded that the plaintiff had failed to allege a CUTPA violation concerning the defendant wrestling federation's allegedly "unscrupulous" use of "the legal name of a wrestler" where the plaintiff "failed to allege that the defendants had agreed not to use [the wrestler's] legal name" in the first place.  Likewise, the court in *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1038 (2d Cir. 1995) merely held that defendant did not engage in "immoral" conduct under CUTPA by informing its landlord that, if its rent was not reduced, it would cease paying rent altogether, as such a threat simply involved a routine discussion among businesspeople that, if effectuated, would at most amount to a breach of contract.  Neither of these cases included allegations that the defendants engaged in the type of "egregious breach" that Plaintiff alleges here.

[26]  If anything, *Commercial Union Ins. Co. v. Seven Provinces Inso. Co.,* 217 F.3d 33, 40-43 (1st Cir. 2000) supports Plaintiffs' position.  In *Commercial Union,* the court **upheld** the district

### c. Defendant's Misrepresentations Are Substantially Injurious to Consumers

The final prong of the "cigarette rule" addresses whether the alleged misconduct causes substantial injury to consumers. Here, Plaintiffs allege that they and the members of the Class paid multiples of what they should have for electricity (¶¶30-47, 63) due to Defendant's misconduct, and that the class suffered damages in excess of $5 million as a result (¶¶11, 63). Moreover, Plaintiffs provide a detailed numerical analysis both of their own losses (¶¶37, 39-47) and the scale of the losses suffered by the most damaged members of the class (¶¶31-38) to demonstrate the harm to consumers. Accordingly, Plaintiffs have explained how Starion has substantially harmed them individually and the class as a whole. Defendant's principal response – that neither Gruber nor Ferdinand suffered an ascertainable loss (Def. Mem. at 24-25, 34-35) – is incorrect, as set forth in Parts II.B.1.b and II.B.2.b above.[27]

Defendant's argument that Plaintiffs and putative class members should have canceled their contracts if they disliked Defendant's variable rates (Def. Mem. at 34) misses the point: Plaintiffs didn't **know** that the rates they were being charged by Defendant were exorbitant **because** Defendant's unfair acts (*i.e.*, their representations in their contracts) concealed that fact. The question of whether reasonable customers should be required to routinely track their electric supplier's prices as against underlying wholesale costs (in order to confirm whether the supplier is meeting its express contractual promises concerning pricing) is not a matter for resolution on a

---

court's determination that the defendant's intentionally improper conduct (in obstructing the plaintiff's insurance claim) was not a mere breach of contract but amounted to an MCPA violation. Similarly, the court in *Gabriel v. Jackson National Life Ins. Co.,* No. 11-12307-MLW, 2015 WL 1410406, at *17-18 (D. Mass. March 26, 2015) found that the defendant **did** violate the MCPA by "repeatedly induc[ing plaintiff] to pay excess [insurance] premiums before they came due."

[27] Similarly, for the reasons set forth above (at Part IV.A.1.a), Defendant's reliance on *Zahn* is unavailing.

motion to dismiss.  In any event, at a minimum, class members would be entitled to damages for the first month in which their bills (improperly) increased, before they had the opportunity to cancel even if they were closely monitoring power rates.

**B.      Plaintiffs State a Claim That Defendant Breached the Covenant of Good Faith and Fair Dealing**

Defendant breached its contracts with Plaintiffs by violating the covenant of good faith and fair dealing.  In Connecticut and Massachusetts (as in most states), "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain General Hospital*, 239 Conn. 574, 598 (1996); *see* Restatement (Second) of Contracts, § 205.[28] "Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." *Magnan v. Anaconda Industries*, 193 Conn. 558, 567 (1984).   Notably, a violation of *either* the covenant of good faith and fair dealing *or* of the express terms of a contract "breach" the contract, as they both violate integral components of the agreement.   "The covenant logically does not create new contractual obligations, but rather suggests that if several alternative constructions of a contract are possible, ***the one consistent with fair dealing and the reasonable expectations of the parties ought to be adopted.***" *Hoffnagle v. Henderson,* No. CV020813972S, 2003 WL 21150549, at *3 (Conn. Super. Ct. Apr. 17, 2003) (emphasis added), *on reconsideration in part,* 2003 WL 22206236 (Conn. Super. Ct. Sept. 10, 2003).[29]

---

[28]  Defendant does not dispute that the law of breach of the covenant of good faith and fair dealing is substantively the same in Massachusetts as in Connecticut

[29]  Accordingly, Defendant's argument that Plaintiff does not allege a "breach of contract," but only a breach of the covenant of good faith and fair dealing (Def. Mem. at 38 and n.29), is fundamentally incorrect and misunderstands the nature of a "good faith and fair dealing" claim. A breach of the covenant of good faith and fair dealing ***is*** a breach of the contract.

In order to plead a claim for violation of the covenant of good faith and fair dealing, a plaintiff must allege "(1) two parties entered into a contract from which the plaintiff reasonably expected a benefit, (2) the defendant's actions denied or obstructed the plaintiff's expected benefit of the bargain, and (3) the injurious actions were the product of defendant's bad faith." *Royal Indem. Co. v. King,* 532 F. Supp. 2d 404, 414 (D. Conn. 2008). Here, based on Defendant's misrepresentations, Plaintiffs reasonably expected that Defendant's variable rates would fluctuate in a manner correlated with Defendant's underlying wholesale electricity costs. ¶¶29, 70. Defendant's decision to gouge its customers by setting a price completely unrelated to its own wholesale costs deprived Plaintiffs and the Class of the benefit of that expectation, causing them to suffer financial harm when they were charged up to six times the wholesale rate. This conduct is especially egregious given that, as discussed above, Defendant's ***only*** "market" cost is the wholesale cost of power, and its other costs are relatively fixed standard business expenses that could not be a basis for price changes. *See* Part II.A above*;* ¶¶18, 34-35.

Indeed, several courts have already held that similar variable rate gouging by energy suppliers constitutes a breach of similar contracts. For example, in *Slack v. Suburban Propane Partners,* No. 10-2548 (JLL), 2010 WL 5392845 (D.N.J. Dec. 22, 2010), the court upheld the plaintiff's claim for breach of the implied covenant of good faith and fair dealing, even though the contract did "not disclose the method by which [defendant] calculates prices" at all (and thus defendant could argue it had no contractual pricing obligation whatsoever). *Id.* at *1, 10-11 (denying motion to dismiss claim of covenant of good faith and fair dealing where plaintiff alleged that defendant "does not meaningfully disclose how its prices are determined" and that it

charged "exorbitant and arbitrary" prices).[30]  Likewise, in *Yang Chen*, 2014 WL 7389011, at *6-7, the court upheld the sufficiency of plaintiff's breach of contract claim where defendant charged variable prices (only) two to three times the underlying wholesale rates.[31]

Defendant's argument that Plaintiffs cannot claim a breach of the covenant of good faith and fair dealing because, in essence, neither purportedly suffered an ascertainable loss (Def. Mem. at 39) is incorrect for all of the reasons discussed in Parts II.B.1.b and II.B.2.b above. Defendant's argument that its contract does not tie the variable rate to the wholesale price of electricity "in any way, shape or form" is likewise simply wrong.  *See* Parts II and IV.A above. Accordingly, Defendant's reliance on *Faistl v. Energy Plus Holdings, LLC,* No. 12-2879 (JLL), 2012 WL 3835815, at *7 (D.N.J. Sept. 4, 2012), for the proposition that Plaintiffs "fail[ed] to identify any provision of any contract … that Starion allegedly breached" (Def. Mem. at 38 n.20), is inapposite.  At a minimum, a reasonable consumer's interpretation of this language is a question for the finder of fact and not amenable to resolution on a motion to dismiss.[32]

---

[30] Although the *Slack* decision sustained the breach of implied covenant of good faith and fair dealing claim, it dismissed plaintiff's statutory unfair trade practices claim because bare allegations that costs were "neither 'fair' nor 'reasonable'" could not, "***without more,***" sustain a consumer fraud claim.  2010 WL 5392845, at *7 (emphasis added).  Here, Plaintiffs **have** alleged more: the fact that Defendant's contract expressly ties its variable prices to its wholesale cost of power, even as its actual **practice** is to charge prices without regard to those costs.  Indeed, Plaintiffs include **specific figures** in the SAC **demonstrating** that Starion's variable rate did not, as it promised, "reflect" the wholesale price.  ¶¶28-29.  This goes far beyond the allegations the plaintiff appears to have made in *Slack*.

[31] The *Yang Chen* court upheld plaintiff's claim for breach of **express** contract, holding that plaintiff had adequately alleged that Defendant's 200-300% markups went beyond what was allowed under this language.  The court then dismissed the claim for breach of the **implied** covenant of good faith and fair dealing, solely on the basis that claims for breach of express contract and the implied covenant cannot coexist in the same complaint.  Plaintiff believes that her claim is more properly analyzed as a breach of the implied covenant and fair dealing – and nothing in *Yang Chen* states or implies otherwise – but could amend her complaint to plead breach of express contract if this Court believes that is the more appropriate analysis.

[32] Notably, even though the *Faistl* court (at *6-7) also dismissed the plaintiff's "covenant of good faith" claim for failure to allege defendant's "bad faith" sufficiently, Defendant does **not**

Moreover, Defendant's argument that Plaintiffs' "bad faith" claim is simply an "improper attempt to re-write the language of their contracts" (Def. Mem. at 39), completely misapprehends the fundamental nature of the covenant of good faith and fair dealing.  Plaintiff acknowledges that the contract grants Defendant discretion in setting variable prices.  However, that discretion is ***not*** unfettered.  If Defendant truly could set any price at all – whether six times its wholesale price, or sixty, or six hundred, at its whim – then Defendant effectively would not be making any commitment at all.  In other words, its contract with Plaintiff would be illusory.  *See* Williston on Contracts, § 4:24 (4th Ed.).  The covenant of good faith and fair dealing is specifically intended to solve this problem and save contracts that would otherwise be void, by requiring that any discretion permitted under a contract be exercised reasonably and in accord with both parties' expectations on entering the contract. *Sadowski v. Dell Computer Corp.,* 268 F. Supp. 2d 129, 136 (D. Conn. 2003) ("[W]here possible, courts will imply a limited obligation of good faith or reasonableness in the exercise of such discretion to avoid an illusory promise"); *Stanley Works v. Halstead New England Corp.,* No. CV010506367S, 2001 WL 651208, at *2 (Conn. Sup. Ct. May 18, 2001) ("'[t]he tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears the parties intended a contract . . . . An implied obligation to

---

cite *Faistl* for that proposition – or, indeed, make any argument at all that Plaintiff has failed adequately to allege Defendant's "bad faith."  Nor could it.  Plaintiff alleges that Defendant's prices were up to six times their wholesale costs – and, more particularly, that Defendant maintained those exorbitant rates even when the wholesale price plummeted, even though Defendant has no other market costs and only fixed variable costs.  These allegations fully satisfy Plaintiff's pleading obligation.  For example, in *Slack, supra,* at *10-11, the court found that plaintiff adequately pled "bad faith" simply by alleging that Defendant would offer price reductions when consumers complained, because that allegation "could be construed as suggestive that [d]efendants have exercised their discretionary authority over [their] pricing arrangements in an arbitrary or unreasonable manner."  Plaintiff's allegations here are at least as strong.  Moreover, Plaintiff has specifically alleged that "Starion's essential representation to consumers concerning its variable pricing – that [it] is 'market-based' – is patently false."  ¶ 31.  Such a "design to mislead or deceive another" is evidence of bad faith. *19 Perry St., LLC v. Unionville Water Co.*, 294 Conn. 611, 637 (2010).

use good faith is enough to avoid the finding of an illusory promise'") (quoting *HLO Land Ownership A. Ltd. v. Hartford,* 248 Conn. 350, 363 (1999)).   Here, Defendant's assertion that it is entitled to charge any price it pleases would render the contract illusory and void, especially given that Defendant does not generate, transmit or distribute power, and the price charged per kilowatt hour is the ***only*** material term in the contract.  Plaintiff, on the other hand, does not seek to void the contract because the implied covenant enforces the reasonable expectation, created by the contract itself, that Defendant's variable rates would be reasonably correlated to its electricity costs and market conditions.

Contrary to Defendant's argument, *Capstone Building Corp. v. American Motorists Ins. Co.,* 308 Conn. 760 (2013) (Def. Mem. at 21-22) does not support dismissal of Plaintiff's "bad faith" claim.  In *Capstone,* the plaintiff alleged that the defendant insurance company violated the covenant of good faith and fair dealing by failing to conduct an adequate investigation before denying a claim.  *Id.* at 793-803.  However, the court noted that the underlying contract "specifically disclaim[ed] any duty to investigate claims" ***at all***.  Accordingly, there could be no "bad faith cause of action based solely on an allegedly inadequate discretionary investigation" that defendant was under no obligation to conduct (although plaintiff could still bring a claim for wrongful denial of a benefit).  *Id.* at 796-98.  Here, in contrast, Defendant had an express contractual duty to provide power at ***some*** variable rate.  Defendant was given some discretion in setting a specific rate, which discretion was cabined, first, by its promise that the rate would be "reflect" Starion's own "cost" of obtaining electricity, and, second, by its obligation to exercise that discretion in accordance with good faith and fair dealing. *Sadowski,* 268 F. Supp. 2d at 136

30

(courts imply obligation that discretion under a contract be exercised in good faith to avoid a determination that the contract is illusory).[33]

### C.     Plaintiffs Have Standing To Request Injunctive Relief

Contrary to Defendant's throwaway final argument (Def. Mem. at 44), Plaintiffs have standing to pursue injunctive relief barring Defendant from continuing to misrepresent its pricing practices in its contracts.  Courts in this Circuit have repeatedly confirmed that plaintiffs in a class action may seek to enjoin a defendant's misrepresentations *even after* the plaintiffs personally learn the truth and even if they discontinue using the misrepresented product, so that other, less-fortunate class members will not be similarly harmed.  "[P]laintiffs have standing to seek injunctive relief based on the allegation that a product's labeling or marketing is misleading to a reasonable consumer," because to "hold otherwise would effectively bar any consumer who avoids the offending product from seeking injunctive relief." *Ackerman v. Coca–Cola Co.,* No. 09–CV–395, 2013 WL 7044866, at *2–3, *14–15, *15 n. 23 (E.D.N.Y. July 18, 2013) (report and recommendation) (collecting cases).  "Public policy, as well as precedent, supports th[is] rule" because "[w]hile plaintiffs may not purchase the same ... products as they purchased during

---

[33] Defendant's reliance on *Caires v. JP Morgan Chase Bank N.A.,* 880 F. Supp. 2d 288, 307-08 (D. Conn. 2012) (Def. Mem. at 39-40), is similarly misplaced.  In *Caires,* the court dismissed the plaintiff-borrower's "bad faith" claims arising under a residential construction contract as too "generalized" and completely "devoid" of specific factual allegations stating the benefits he expected to receive or how the defendant-lender's acts "impeded his right to receive benefits." For example, the plaintiff alleged that defendant acted in bad faith by failing to lower his interest rate pursuant to a specific contract provision, but the court concluded that, under the plain language of the loan agreement, "the loan documents do not provide for the interest rate to convert as [plaintiff] alleges." *Id.* at 308.  Here, as discussed above, the relevant contract language directly supports Plaintiffs' claim.  Defendant's reliance on *Mass. Eye & Ear Infirmary, supra,* is equally unavailing.  That court merely concluded that there was no breach of the implied covenant of good faith and fair dealing given the court's conclusion that the parties had not entered a contract *at all*.  *Id.* at *230.  Here, there is no dispute that the parties had a contract, and so Defendant had a duty of good faith and fair dealing in performing its duties thereunder.

the class period, because they are now aware of the true content of the products, to prevent them from bringing suit on behalf of a class in federal court would surely thwart the objective" of state consumer protection laws. *Belfiore v. Procter & Gamble Co.,* No. 14-CV-4090, 2015 WL 1402313, at *3 (E.D.N.Y. March 25, 2015) (internal citations and quotation marks omitted). *See Delgado v. Ocwen Loan Servicing, LLC,* No. 13–CV–4427, 2014 WL 4773991, at *14 (E.D.N.Y. Sept. 24, 2014) ("[f]inding that Plaintiffs have no federal standing to enjoin a deceptive practice once they become aware of the scheme would eviscerate the intent of" state consumer protection statutes), *Ries v. Arizona Beverages,* 287 F.R.D. 523, 533 (N.D. Cal. 2012) ("Defendants argue further that plaintiffs are not threatened by future harm because they are now aware of the [alleged misrepresentations and can no longer be deceived; but that contention may be dispatched with relative ease. . . . Plaintiffs request to be relieved from false advertising by defendants in the future, and the fact that they discovered the supposed deception some years ago does not render the advertising any more truthful. Should plaintiffs encounter the [misrepresentation again] today, they could not rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress.").

Defendant's sole argument – that Plaintiffs lacks cannot seek injunctive relief because they have already cancelled their contracts with Starion and so lack standing (Def. Mem. at 44) – is without merit. In the cases discussed above, the named plaintiffs were entitled to pursue injunctions for the benefit of absent class members even though their purchases had been completed. Moreover, given that electricity is completely fungible, and that Starion sells the exact same power as every else, Plaintiffs could contract with Starion again if Starion began telling the truth and offered fair prices.

The single case relied upon by Defendant – *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340 (2d Cir. 1998) – does not support Defendant's position.  In *Safir*, the Second Circuit held that a class of children arrested on delinquency charges and interrogated by the New York police **did** have standing to seek injunctive relief, in part because the challenged interrogation practices were "officially endorsed policies" and so "there is a likelihood of recurring injury" even if the named plaintiffs were no longer in custody.  *Id.* at *344-45.  The Second Circuit distinguished *City of Los Angeles v. Lyons,* 461 U.S. 95 (1983), in which the Supreme Court held that the individual plaintiff did not have standing to seek an injunction against the Los Angeles Police Department's use of choke holds absent an allegation that the LAPD had a general practice of using them.  *Id.*  Here, Plaintiffs allege that Defendant has a general, across-the-board practice of charging inflated rates in violation of Starion's contracts with its customers.  ¶¶4-6, 30-47.  Moreover, there is no dispute that Defendant has a practice of charging a variable rate; the only question is whether that rate is set in accord with the general, across-the-board service agreements.  Because Starion's pricing practices create "a likelihood of recurring injury," Plaintiffs are entitled to seek to enjoin Starion's misrepresentations even under Defendant's own authority.

D.      **Plaintiffs May Seek Declaratory Relief**

Although less significant given Plaintiffs' clear right to seek injunctive relief as discussed above, Plaintiffs may also, contrary to Defendant's argument (Def. Mem. at 40-42), seek declaratory relief, based on a similar "capable of repetition yet avoiding review" theory as discussed above regarding injunctive relief.  For example, the court in *Ries* concluded that plaintiff's false labeling claims (in which the named plaintiff had originally, but no longer, believed defendant's misrepresentations that defendant products were 100% natural)

33

"exemplifies the kind of action that may be appropriate for certification under Rule 23(b)(2) [for]

declaratory relief that the alleged practices are unlawful." 287 F.R.D. at 241.[34]

Defendant is also incorrect that Plaintiffs' declaratory claims must necessarily be

dismissed as serving "no useful purpose" (Def. Mem. at 42-44).  Should this Court again sustain

(as it previously did at the April 7 hearing) Plaintiffs' substantive consumer protection and

covenant of good faith and fair dealing claims, perhaps Plaintiffs' declaratory judgment claim

will be unnecessary.  However, until the Court so rules, it is possible that this Court could

dismiss Plaintiffs' substantive claims on a procedural ground, leaving Plaintiffs' prayer for

declaratory relief as a meaningful alternative.  Notably, in all of the cases cited by Defendant in

which a court struck a claim for declaratory judgment, the defendant had not sought or the court

had not granted dismissal of the plaintiff's relevant substantive claim.[35]

---

[34] By contrast, most of the cases cited by Defendant (Def. Mem. at 40-41) arose in the context of *individual* actions in which the plaintiffs' *individual* contracts had already been terminated, rather than in the context of class actions.  *See Del. State. Univ. Student Hous. Found. v. Ambling Mgmt. Co.,* 556 F. Supp. 2d 367 (D. Del. 2008); *Global Fresh Produce, Inc. v. Epicure Trading, Inc.,* No. 11–01270 (CCC), 2012 WL 924326 (D.N.J. Mar. 16, 2012); *Metra Indus., Inc. v. Rivanna Water & Sewer Auth.,* No. 3:12CV00049, 2014 WL 652253 (W.D. Va. Feb. 19, 2014).  Similarly, in *Peck v. Baldwinsville Cent. Sch. Dist.,* 351 Fed. Appx. 477, 479 (2d Cir. 2009), the Second Circuit held only that a student who had long ago graduated his kindergarten class lacked standing to bring an individual declaratory judgment action concerning the school's alleged censorship of his religious drawing at a school assembly, given that he "points to no policy or custom (or an equivalent) suggesting that any defendant regularly violates students' free speech rights" and so offered no reason to believe there was a "reasonable likelihood" of future harm.  Finally, although *Ward v. Thomas,* 207 F.3d 114 (2d Cir. 2000), was a class action, the Second Circuit concluded that plaintiffs lacked standing to seek declaratory relief because the challenged statute (concerning payment of certain federal benefits) had already been repealed, and so there was no "threat of state officials violating the repealed law in the future." *Id.* at 120. Here, as discussed above, Starion is continuing to make its misrepresentations in its contract to the present day.

[35] *See Metra Indus., supra* (defendant only sought dismissal of declaratory judgment claim); *Torchlight Loan Servs., LLC v. Column Fin. Inc.,* No. 11 Civ. 7426 (RWS), 2912 WL 3065929, at *13 (S.D.N.Y. July 25, 2012) (dismissing declaratory judgment action because "duplicative" of surviving contract claim); *Weihai Textile Group Import & Export Co., Ltd. v. Level 8 Apparel., LLC.,* No. 11 Civ. 4405(ALC)(FM), 2014 WL 1494327, at *14 (S.D.N.Y. March 28,

## V.      CONCLUSION

In order to lure customers into signing up for variable rate plans, Defendant agreed that its variable electric rates would fundamentally reflect Starion's own cost of electricity. Defendant then ignored its own contract and representations and proceeded to charge exorbitant variable prices for its electricity.  Accordingly, Plaintiffs respectfully request that the Court deny Defendant's Motion in its entirety.  In the event the Court grants the Motion, Plaintiffs respectfully request leave to amend to address any deficiencies identified by the Court.


DATED: July 13, 2015                                    Respectfully submitted,


                                                        PLAINTIFF

                                                         \s\ Robert A. Izard
                                                        By: Robert A. Izard (ct01601)
                                                        Seth R. Klein (ct18121)
                                                        Nicole A. Veno (ct29373)
                                                        IZARD NOBEL LLP
                                                        29 South Main Street, Suite 305
                                                        West Hartford, CT  06107
                                                        (860) 493-6292

---

2014) (same in context of motion for summary judgment); *Navarez v. Wilshire Credit Corp.,* 757 F. Supp. 2d 621, 636 (N.D. Tex. 2010); *JJCK, LLC v. Project Lifesaver Int'l,* No. 10-930-LPS, 2011 WL 2610371, at *6 (D. Del. July 1, 2011); *ULC Oil & Gas Field Servs. v. EXCO Res. (PA), LLC,* No. 2:14-cv-72, 2014 WL 6607280, at *8 (W.D. Pa. Nov. 19, 2014).  *See also City of New York v. McDonough St. Comm. Ctr., Inc.,* No. 13-CV-03869 (FB)(RER), 2014 WL 4467818, at *4 (E.D.N.Y. Sept. 9, 2014) (denying declaratory relief as redundant after defaulting defendant for failure to respond to substantive breach of contract claim).

**<u>CERTIFICATE OF SERVICE</u>**

I, Seth R. Klein, hereby certify that on this 13[h] day of July, 2015, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this document though the court's CM/ECF system.


<u>/s/ Seth R. Klein</u>
Seth R. Klein